Good morning, Your Honor. Carrie Hempel, attorney for Petitioner Glenda Jo Virgil. Morning, Counsel. Gail Gonzales for the Respondent, Your Honor. Morning, Counsel. Thank you. All right. Ms. Hempel. May it please the Court, seated at me, seated with me at counsel table is my colleague Erwin Chemerinsky, and I'd like to reserve three minutes for rebuttal. This Court should find trial counsel's investigation unreasonable in accordance with a recent Supreme Court decision in Wiggins v. Smith. In Wiggins, the Court held that the information counsel discovered in the records before them concerning mitigation evidence triggered an obligation to further investigate the use of such evidence, and that the failure to do so was an unreasonable investigation in violation of the first prong in Strickland. Counsel, as I understand your opponent's argument, it's basically that he took the view as a lawyer that it didn't matter what he would have determined, that he assumed that the defense, the battered woman syndrome defense, could be offered and could be a strong defense. But he felt there were more disadvantages to offering that defense than advantages. And therefore, and maybe I'm overstating their argument, maybe they'll disagree. But as I understand their argument, you can assume that had he investigated, he would have been able to offer a strong defense on battered women's syndrome. But he made the judgment that the jury would be more put off by the other things it would learn, and therefore, tactically, he decided not to offer. So he, in effect, sort of concedes that he didn't make the investigation, but that he had a valid reason, because no matter what it discovered, it would not have affected his decision. Is that a misstatement of their position? Well, Your Honor, I don't believe it's a misstatement of their position, because they're Well, I'm not so sure they say that he concedes he didn't investigate. I don't know that investigation, the law has yet said, means you have to go out and talk to each person. In other words, I don't know that an attorney has not investigated if an investigator goes out and takes a statement and brings it back to him and he reads it. And this attorney says all that stuff was in the file and he read it all. So I'm not so sure that it doesn't slightly overstate the case to say they concede there was no investigation. Well, let's say they're assuming arguendo that that that their maybe their two positions. But the first position is that assuming all of that, assuming that they did no investigation whatsoever, that he didn't wasn't interested in determining that, because he felt that even if he could uncover a strong defense, it would be tactically unwise to present it. And then the second issue we can discuss is whether he, in fact, failed to make an adequate investigation. Well, if I may discuss the investigation point first, because I think it goes to your point with respect to whether or not his decisions with respect to the harmful evidence were, in fact, justified. It's precisely because he was given a case file that contained so much evidence supporting a battered women's syndrome defense that he had an obligation to go further. He did not have the personal experience, the training, or the expertise to make a decision not to present this evidence without more information. He had choices. He could have used the expert that Ms. Freeman had prepared. If he didn't like that expert, which he has testified that he had some doubts about that expert at the evidentiary hearing, he could have found his own expert and had that person evaluate Ms. Virgil. Instead, trial counsel on his own and without consulting any expert made a decision not to investigate further. And in this respect That assumes that assumes the answer, though, it sounds to me. Because everything that was in that file and presumably was videotapes, tapes of consultation with the experts, et cetera, was enough to make one counsel decide, well, yeah, I think I'll go forward with BWS. This guy looked at it and said, you know, I read all this stuff and I understand what it says, but I just don't think that's a good defense. Why you haven't really quite explained why he had to go and talk to somebody again and say, doctor, am I right? It's not such a good defense. And the doctor said, no, I think BWS is great stuff. What do doctors know about defense? Say, I think BWS is great stuff. But he is a trial lawyer. So I don't think it's a good defense in this case. Yes. But don't you assume away? Don't you assume the answer when you say, oh, well, he had to go and talk to people. He had talked to a BWS expert. He would have understood the significance of the incest conviction in the context of this case. He would have understood that. Well, you're sort of getting to the second issue with that. The first question is, is it ineffective to see what there was in that file about battered women's syndrome and say, now I know enough to decide I'm not going to use it? Forget that they were balancing things. Yes, Your Honor. It was ineffective because in this case, all of the evidence in the file supported a BWS using BWS evidence in the self-defense, which is the same theory that he used. And if he was not going to use it based on all that evidence in the file, he needed to pursue his investigation further. And as part of that, he needed to go to the court and make some in limine motions with regard to any harmful evidence regarding that. That's the second issue. The first issue is forget the disadvantages. Just on the question of whether it's a good defense, which I think is Fernandez's question, I think, that was there any reason for him to do more than read the file in order to decide that that's not the kind of defense he wanted to offer, forgetting the disadvantages? Yes, there were reasons. If he had talked to a BWS expert, he would have hopefully understood that his characterizations of the altercations between Ms. Virgil and Mr. Garrett, instead of referring to them as mutual combat, as he did in the evidentiary hearing, he would have understood that battered women often engage in aggressive behaviors in response to beatings and abuse. And again, he also would have understood that with respect to the harmful evidence, such as an antisocial personality disorder diagnosis, that that diagnosis might never have occurred. Dr. Ryan, the only BWS expert who evaluated Ms. Virgil, did not render an antisocial personality disorder diagnosis. The person who did was Dr. Martindale, who was a treating physician and wrote it in clinical notes. He was a treating physician at the jail. So he would have had a better understanding of the impact of any antisocial personality disorder traits, that those are also traits that are common characteristics of someone who has been battered or someone who is suffering from battered women syndrome. The question though is, part of the question though is, does Consul have to have a perfect understanding of everything before making the decision? You seem to be saying, yup, he had to have a really, really, really, really, really good understanding. No, he does not have to have a perfect understanding. But given the file that he was handed in this case, and the fact that there was a very good evidence supporting battered women syndrome presented to him, he had an obligation to look further at that before rejecting it on his own, without consulting with any kind of BWS expert. Counsel, what effect does the existence of the law clerk memo saying that Ms. Virgil barely fit into the BWS profile and the jury interviews, what effect does that have on your analysis? Well, with respect to the law clerk profile, I believe you're referring to Mr. Cerna's memo, he testified at the evidentiary hearing that that was a preliminary memo, and he believed that there was a second memo, although there wasn't one in the file, but that that memo was written before Dr. Ryan had actually evaluated Ms. Virgil and determined whether or not she fell into BWS category. And secondly, with respect to the jury instructions, trial counsel admitted in the hearing that he did not rely on the jury instruction or, I'm sorry, the jury interviews after trial as a reason for choosing or not choosing BWS evidence. So, Your Honors, with respect to the other ground that counsel used for not presenting BWS testimony, this is the arrest and probation reports. Those reports were inadmissible hearsay, and trial counsel also admitted as much in the evidentiary hearing. And some counsel chose to abandon his investigation. Excuse me. I realize that my time is out, and I'd like to proceed. Well, you can continue. This is somewhat flexible on time. When time is established by a clerk who has no idea what the case is about but weights it by the number of issues, that really is not a very good measure of how much time a case takes. So you can continue. Okay. In sum, counsel chose to abandon his investigation at an unreasonable juncture, and this made a fully informed decision as to whether to present the evidence impossible. Furthermore, the failure to present the evidence privileged Ms. Virgil because she — because such evidence would have greatly bolstered her credibility and would have supported her self-defense claim. The outcome of the trial, as trial counsel testified in the evidentiary hearing, turned on her credibility. If BWS evidence had been presented, the jury would have heard more testimony about things such as why a battered woman may stay with her batterer, why she may still love her batterer, why she might lie to protect herself, why she might hide the battering from others, why she might lie to police, as in this case, immediately after the killing, why she has memory lapses and uses substances. Such evidence would have countered the effect, in this case, of the prosecution's use on cross-examination of questions that undermine Ms. Virgil's credibility by questioning her about issues such as mutual combat and those kinds of matters. The counsel, wasn't there testimony from a witness who said that Ms. Virgil was afraid that she would hurt the victim as opposed to him hurting her on the night of the incident? Yes, there was. There was testimony at trial that Ms. Virgil said, you know, I'm afraid something to the effect of I'm afraid that she said, I'm afraid someone's going to get killed, and the witness said that she said, you won't be killed, and she said, I'm not worried about that. But both the witness at trial and Ms. Virgil testified that they both felt that this was made in passing and that people make those kinds of statements and they're not indication of premeditation or an intent to kill. And given all the overwhelming evidence in this case about the injuries to Ms. Virgil, the times that Ms. Virgil was beaten, that she was stabbed in the leg with a knife, that she was hit in the head with the butt of a gun, it's very, it's just not in accordance with what was going on in this case, that she would kill Mr. Virgil unless she were feeling that she was in imminent danger of serious harm, which is what this kind of evidence would have supported. Thank you, counsel. May it please the Court, Gail Gonzales with the Attorney General's Office for responding. Your Honors, in this 16-year-old state court homicide judgment, we see the classic reason why reviewing courts must give high deference to the strategy and tactics of defense counsel. Here, we have a situation where if Mr. Nimmo, the trial defense attorney, had done exactly as current counsel is saying he should have done, you can bet we would be in this courtroom today, we'd still be arguing ineffective assistance counsel. The only difference would be that they would say he prejudiced her so badly with all this inflammatory information about her background when he didn't have to do it. He had another means of presenting a self-defense in this case. Is that a standard argument that the State makes every time there is a habeas case, no matter what the lawyer did? It's not, Your Honor. But in this case, I believe that's a standard argument. It doesn't have much to do with the merits of this case. It doesn't have much to do with the merits, but it demonstrates why we give such high deference to trial counsel's strategy. And here, his strategy was clear. No, he gives deference if he does his job of investigating. That's right, Your Honor. Now, there's no question that had he investigated fully that they would not be able to make the argument that he didn't do it. He did investigate fully, Your Honor. In fact, the district court said he went far beyond what he needed to do. By reading the file? No, that's not all he did. What did he do to determine whether there was a mental health defense other than read the file? Your Honor, let's start at day one. He was at the trial court when the mistrial was declared in the first trial. He immediately started interviewing the jurors because he was present at the time. And in interviewing the jurors, he found that the jurors were not accepting. The opposing counsel said he didn't rely on that. That's not correct. Not true. I think if you look at the transcript of the evidentiary hearing, you see that he clearly states he was finding that they were simply not accepting the battered women syndrome evidence as we presented to them. In fact, some of the jurors were saying, not believable. But they hadn't heard the evidence as it applied to the defendants. They heard the direct testimony of the battered women syndrome expert. They did not hear the cross-examination, which — Had he completed his direct testimony? I believe he had completed his direct, but I'm not positive about that. I know that he had not been cross-examined. Well, my understanding is that he had not testified about the defendant. He had given general testimony about the nature of the defense. Well, nevertheless, Your Honor, I would submit that Mr. Nimmo knew how Dr. Ryan, the battered women syndrome expert, was thinking, because he had listened to two hours of tape-recorded conversation between Ms. Brawley, the first attorney on the case, and Dr. Ryan. Not only that, but he read Dr. Ryan's report. In addition to that, he contacted — he retained his own mental health expert, Dr. Grinberg, a psychiatrist, and he discussed the concept of battered women syndrome with Dr. Grinberg. Without telling Dr. Grinberg anything about the individual defendant or her mental health history? He says he talked — Or without having the doctor talk to the patient or the client? He did that for strategic reasons, Your Honor. He did not want to subject Dr. Grinberg to cross-examination with regard to the defendant's background, and that is why he did that. But I do believe he presented the case in hypotheticals to Dr. Grinberg, because in cross-examination of Dr. Grinberg, the prosecutor asked Dr. Grinberg, were you aware of these facts previously? To testify, and he stated, yes. Dr. Grinberg additionally listened to the police interviews of — of appellant. So he was quite familiar with the case. And after having conducted all these interviews and measures and — But all these interviews, what — what — all what interviews? Did Dr. Grinberg? Ten times he met with the appellant, Your Honor, ten times in preparation for this. Now, appellant's counsel is stating that, well, he didn't get enough information about the violence from — from these ten discussions that he had with the appellant. But yet — In person? He met with her in person ten times, or over the telephone? He — he met — I don't — I don't know that, the answer to that, Your Honor. All right. So meeting with her does not mean a telephone call. His testimony was that he spoke with her on ten different occasions. That's different from meeting with her. The specific answer to your question, I don't — I don't know, Your Honor. But as the district court pointed out, it wasn't a matter of getting more and more and more specific acts of violence. He presented a substantial amount of violence. This was a strategic decision to pursue another angle of attack, one that would not expose anything about — as a matter of fact, you know, I would submit that this trial was unfair to the prosecution, if anybody, because Mr. Nimmo — Could we throw it out on that basis? No, I don't believe so, Your Honor. The prosecutor fought hard, believing that Mr. Nimmo had been opening the door. The trial transcript is full of arguments where Mr. Nimmo is trying to justify that he has not opened the door, and the Court keeps telling Mr. Nimmo, you're coming dangerously close. I'm warning you once again. Mr. Nimmo got into all the psychological background of the victim, all kinds of specific acts of violence, and yet they weren't allowed to touch appellant's psychological background at all, in any respect. And I would submit that that was simply unfair to the prosecution. Nevertheless, that's the way the case proceeded. But I would submit that there was thorough investigation in this case. And the Strickland opinion out of U.S. Supreme Court states that if an investigation is less than complete, counsel need not take further steps if it's reasonable not to do so. And I would submit it was reasonable in this case. He knew a substantial amount about battered women syndrome, which was approximately a five-year-old concept in 1987. But nevertheless, he knew a substantial amount about it, and I think this record supports that. Before I conclude, I would like to state that we would request that the Court apply the deference standard to the prejudice prong of the Strickland case. Now, counsel has pointed out that in the initial stages of the briefing in this case, back in 1998, when the case was pending in the Central District before it got transferred to the Southern District, that I mischaracterized the State court's ruling. And that's true. I did. At that time, AEDPA was fairly new on the books. The law was changing almost on a daily basis. And at that time, I did mischaracterize and state that there had not been any merits decision. However, I corrected that while the case was still pending before the magistrate judge. And I made an argument at the conclusion of the evidentiary hearing, and they state that I did not argue it before the magistrate judge, but that is currently incorrect. If you look at pages 94 to 96 of the evidentiary hearing transcript, you clearly see the deference argument there. I read to the magistrate judge what the California Court of Appeals stated. They stated, quote, I would submit, Your Honor, that that is the precise language and the precise test of the prejudice prong of Strickland. And that is a merits decision on the prejudice prong of Strickland that the State court is entitled to deference on. And we would respectfully request that the Court grant deference on that. I also made that argument in objections to the magistrate judge. And I would lastly point out that both the magistrate judge and the district court applied the deference standard. Unless the Court has any questions, I have nothing further. Thank you, Your Honor. Your Honors, there's no ADEPA issue in this case. The court of appeal decided the opinion on a procedural bar ground and looked at the manifest injustice exception to that ground, which has a prejudice component. But the court of appeal opinion clearly states that this decision was faced on a procedural bar and did not consider the merits of the case. The court said it's not a miscarriage of justice. And then it says what Consul just quoted is the same. I'm sorry? The court said it was no miscarriage of justice and then made the statement, the specific factual statement that Consul just quoted. Yes, Your Honor, but that is one. The court said the jury disbelieved the claim. She has not shown there's a reasonable probability that the outcome of the trial would have been different had she presented expert testimony on battered women's syndrome. That's what the court said. Right? That's right. And that is one portion of the manifest injustice exception to the procedural bar test, which is not a decision on the merits. But it also happens to be a standard that we recognize. Yes, but there was no development of any facts of the case on the merit in the decision of the court of appeals. It was based purely on a procedural bar. They did not consider Strickland. Well, but that's far from saying the court of appeals did not state we find that this is the case, and that is what they stated. Correct? They did state that, yes, but it was on consideration of the issue of a procedural bar and not a consideration of the case on the merits. Well, that's a factual statement, whatever you consider it on. It's a factual statement without based on any development of the record. Your Honor. Except, of course, the whole record from the trial. Your Honor, with respect to whether defense counsel's investigation was adequate, two points. In response to the Grinberg, he was not a BWS expert, and he did not evaluate Virgil or know the factual circumstances of this case. Moreover, we are not arguing that counsel was compelled to bring in harmful evidence. What we're arguing is that he should have made in limine motions to determine whether, in fact, that evidence would come in. He did not. He based his decision on speculation, and then he made a decision not to use that evidence based on speculation. Finally, his conduct here cannot be considered a strategic decision because pursuant to Wiggins, trial counsel's failure to present, failure to investigate, failure to present BWS evidence cannot be viewed as a strategic choice because it was based on an unreasonable decision not to investigate further. Thank you. Thank you, counsel. The case just argued will be submitted.
judges: Reinhardt, Fernandez, Rawlinson